UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:12-cv-81406

**DONNA JANE WATTS,**

Plaintiff,

v.

**CITY OF PALM BEACH GARDENS**,
et al.,

Defendants.

_____/

**MOTION TO DISMISS AMENDED COMPLAINT
BY DEFENDANTS JONES, BAILEY and BRIERTON**

Julie L. Jones, the Executive Director of the Florida Department of Highway Safety and

Motor Vehicles; Gerald Bailey, commissioner of the Florida Department of Law Enforcement;

and Colonel David H. Brierton, Jr., Florida Highway Patrol Director, move to dismiss the second

amended complaint pursuant to Fed.R.Civ.P. 12(b)(6).

**NATURE OF THE CLAIMS**

In October 2011, the plaintiff, a Florida Highway Patrol trooper, pursued and arrested a

Miami police officer for driving recklessly at speeds as high as 120 mph on I-95. DE 514 para.

142.

The arrest received considerable media attention. Starting shortly afterward, the plaintiff

alleges, law enforcement officers around the state began accessing driver license information

about her collected by the Department of Highway Safety and Motor Vehicles (DHSMV)

through the driver license data base known as DAVID. Florida law enforcement officers have

access to DAVID for public safety and law enforcement purposes pursuant to the state's police

power in maintaining public safety on the state's roads. DE 514 para. 129. From October 2011 to January 19, 2012, the plaintiff alleges that more than 88 Florida law enforcement officers accessed her personal driver information. DE 514 para. 157. She asserts that these officers had no law enforcement reason for doing so.

The plaintiff alleges that as a result of officers obtaining "her home address, color photograph or image, social security number, date of birth, state of birth, detailed vehicle registration information and description, prior and current home and mailing addresses," DE 514 para. 318, she alleges was the target of numerous incidents of harassment. DE 514 para. 144-151. However, she does not identify anyone responsible.

The plaintiff sues more than one-hundred law enforcement officers, local governments, and police departments for obtaining her personal driver information for non-law enforcement purposes, and she sues Defendants Jones, Bailey, and Brierton for failing to prevent those officers from obtaining her driver information for a non-law enforcement purpose.

This, she contends, violated the federal Driver Privacy Protection Act (DPPA), 18 U.S.C. ss. 2721 et seq., which imposes strict limitations on the states' ability to use commercially specified information collected pursuant to the state police power; her federal and state rights to privacy; and her Fourth Amendment right to be free from unreasonable search and seizure.

The State defendants are only named in Counts 1, 3, and 4. As explained below, the plaintiff's claims fail as a matter of law because:

- Congress lacks the power under the Commerce Clause to regulate the use of state information that is not "in commerce." The use made by individual law enforcement officers accessing the plaintiff's driver information through DAVID — essentially just looking at it — did not place that information "in commerce" such that Congress could constitutionally regulate its disclosure under DPPA, since such use did not constitute economic activity.

- Congress' attempt to regulate the use of state driver information that is collected and used for public safety purposes and that is not in commerce interferes with the core sovereignty of the state in violation of fundamental principles of federalism and the Tenth Amendment.

- The plaintiff lacks standing to sue Defendants Jones, Bailey and Brierton for alleged DPPA violations on the theories that they failed to train or adequately supervise subordinates. Such a claim is one for a pattern or practice of noncompliance with DPPA. Only the U.S. Attorney General has standing to assert such claims.

- The plaintiff has no reasonable expectation of privacy in information in the hands of a third party, as here, and thus no protected Fourth Amendment interests.

- The plaintiff has no federal constitutional privacy rights in driver information collected by Florida.

- The State defendants are entitled to qualified immunity.

- Florida constitutional law does not recognize any protected privacy interest in information held by the state which is public record; driver information is public record. Moreover, the plaintiff has failed to allege an essential element of a privacy claim, that the information was substantially certain to be publicly disseminated.

## DPPA'S ELEMENTS

The plaintiff's core claim is for a violation of DPPA. Her federal and state constitutional claims all turn on the alleged privacy interest in her driver information Congress created in that statute and imposed upon the States.

The act prohibits the release of an individual's personal information contained in "motor vehicle records," which are "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. s. 2725(1). "Personal information" means "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. s. 2725(3).

3

DPPA prohibits state officials from knowingly disclosing or otherwise making available to any person or entity personal information protected under DPPA. 18 U.S.C.  ss. 2771(a), 2722(a). It is also unlawful to obtain driver information for a purpose not permitted by DPPA. 18 U.S.C.  s. 2722(b).

The act, however, contains exceptions in which state officials may release personal information. For instance, s. 2721(b) states that personal information "shall be disclosed for use in connection with matters of motor vehicle or driver safety . . ." And s. 2721(b)(1) allows disclosures:

> For use by any governmental agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

18 U.S.C.  s. 2721(b)(1).

It is unlawful to falsely represent the reason for requesting personal information. 18 U.S.C.  s. 2722(b).

Congress provided aggrieved individuals whose personal information had been released in violation of DPPA with a private right of action against the individuals responsible for the release and those who obtained the information. 18 U.S.C.  s. 2724(a) provides:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court.

Any person violating DPPA can be liable for actual damages or liquidated damages up to $2,500, and punitive damages.

Congress made clear, however, that aggrieved individuals cannot sue a state or a state agency for a DPPA violation. 18 U.S.C.  s. 2725(2) (defining person to exclude a state or state

4

agency). Only the federal government can sue a state or state agencies. 18 U.S.C. s. 2723(b).

Moreover, individuals lack standing to sue based on allegations a state or state official engages in

a policy or practice of noncompliance with DPPA. 18 U.S.C. s. 2723(b).

## ARGUMENT

I.     **COUNT 1 — CONGRESS LACKS THE POWER TO DICTATE HOW A STATE MAKES DRIVERS'
       PERSONAL INFORMATION AVAILABLE TO ITS LAW ENFORCEMENT COMMUNITY WHEN
       NO ECONOMIC ACTIVITY IS INVOLVED.**

Congress passed DPPA pursuant to its power under the Commerce Clause, U.S. Const.

art. I, § 8, cl. 3, in order to regulate the disclosure and use of drivers' personal data as "things in

commerce." The plaintiff seeks relief under a provision of the act that is beyond Congress's

authority over interstate commerce, because here the act regulates entirely noncommercial

sharing of drivers' personal information within a state's law enforcement community. This

provision exceeds Congress's enumerated powers under the Commerce Clause because the

information at issue is not a thing in commerce under the facts alleged in the complaint; and

DPPA under these circumstances runs afoul of federalism and the Tenth Amendment.

### A.     **DPPA was enacted by Congress pursuant to its commerce power.**

The Supreme Court concluded in *Reno v. Condon*, 528 U.S. 141 (2000), that DPPA was a

valid exercise of the commerce power. However, the case involved a different provision of the

law — one limiting disclosure for the purpose of bulk mail advertising — than the one at issue in

this case, and different facts. *Id.* at 143-145, 148.[1] Thus, *Reno* is only helpful for the general

---

[1]     The Court further underscored the commercial context of the driver data as the basis for
congressional authority by noting:

The motor vehicle information which the States have historically *sold* is *used by
insurers, manufacturers, direct marketers, and others engaged in interstate
commerce* to contact drivers with customized solicitations. The information also

proposition that Congress enacted DPPA pursuant to its commerce power. *Reno* does not control on the question presented in this case: is driver information "in commerce" when a law enforcement officer using a channel restricted to law enforcement functions improperly obtains driver information for a non-commercial purpose such that penalization of that access is within Congress' power under the Commerce Clause? Because the information in this situation is not in commerce and is unconnected to economic activity, the answer must be no.

It is beyond dispute that the Court's holding in *Reno* that DPPA is constitutional was based on the assumption that the driver information subject to the Act is a "thing in interstate commerce" that is being "sold" for use in the private sector by private businesses. It is "in this context" that the "sale or release" of the information "into the interstate stream of business" was deemed "sufficient to support congressional regulation."

The defendants do not dispute that the commerce power extends to States insofar as they sell or offer to sell driver information. Their point is that the commerce power cannot supply the authority to legislate in the context presented here, where the state makes driver information available to state law enforcement agencies pursuant to its police power, even if law enforcement officers who access that information may do so for non-law enforcement and non-economic reasons. In short, Defendants Jones, Bailey and Brierton cannot be held accountable under *federal law* if law enforcement officers improperly access driver information. That is a state matter that should, under our federal system, be addressed by state law.

_____

is used *in the stream of interstate commerce by various public and private entities* for matters related to interstate motoring. Because drivers' information is, *in this context*, an article of commerce, *its sale or release into the interstate stream of business* is sufficient to support congressional regulation.

*Id.* at 148 (emphasis added).

**B.      Congress's commerce power is limited and does not extend to things that are not in interstate commerce or substantially related to interstate commerce — that is, things that do not involve economic activity.**

Congress' power to regulate under the Commerce Clause is restricted to matters involving economic activity. Absent economic activity, Congress has no power to legislate.

In *Nat'l Fed'n of Indep. Bus. v. Sebelius*, – U.S. –, 132 S. Ct. 2566 (2012), (*NFIB*) the United States Supreme Court recently reaffirmed the principle that the Commerce Clause has significant limits that cannot be ignored, in holding that the requirement that most Americans must obtain qualifying healthcare coverage (the Individual Mandate) under the federal Patient Protection and Affordable Care Act of 2010 to be a valid exercise of Congress's power to tax and spend, U.S. Const. art. I, § 8, cl. 1 (a power not implicated in the instant action).

Notably, a majority of the Justices expressly rejected the contention that the Individual Mandate was constitutional under the Commerce Clause, even as augmented by the Necessary and Proper Clause, *id.* at cl. 18.  *See NFIB*, 132 S. Ct. at 2585-93 (Roberts, C.J.) and 2644-50 (four-Justice dissent).[2]

The Chief Justice reaffirmed the longstanding principle that the federal government is one of only limited, specifically enumerated powers and that those not expressly granted to the federal government remained with the states and the people; and that, for Congress to act, it "still must show that a constitutional grant of power authorizes each of its actions." *NFIB*, 132 S. Ct. at 2577-78.  Thus, Congress may act only pursuant to its powers as enumerated in the Constitution.[3]

---

[2]  The Chief Justice expressly declared his opinion to be in accord with the dissent's opinion as regards the restrictions on the Commerce Clause's reach.  *Id.* at 2593.

[3]  *See also, e.g., Dorr v. United States*, 195 U.S. 138, 140 (1904) (it is "settled that the Constitution … is the only source of power authorizing action by any branch of the federal

One of Congress's enumerated powers is the authority to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art I, § 8, cl. 3. In *NFIB*, the Court, quoting its earlier opinion in *United States v. Morrison*, 529 U.S. 598 (2000), set forth the three areas to which Congress's commerce power extends:

> Our precedents read [the Commerce Clause] to mean that Congress may regulate "the channels of interstate commerce," "persons or things in interstate commerce," and "those activities that substantially affect interstate commerce." *Morrison*, *supra*, at 609, 120 S. Ct. 1740 (internal quotation marks omitted).

*NFIB*, 132 S. Ct. at 2578.

Although the reach of the commerce power has expanded, it continues to be subject to limits that must be observed lest Congress "everywhere extend[] the sphere of its activity and draw[] all power into its impetuous vortex." *See id. at 2589* (quoting The Federalist No. 48, at 309 (J. Madison) (C. Rossiter ed. 1961)).

The four-justice dissent in *NFIB*, in that portion of their opinion discussing the Commerce Clause (which, as noted, was declared by the Chief Justice to be in accord with his opinion), agreed with the Chief Justice's view of a commerce power that was subject to definite limits. *NFIB*, 132 S. Ct. at 2646.

Thus, for a regulation by Congress to pass muster under the commerce power, it must regulate either the channels of interstate commerce, things in interstate commerce, or activities that substantially affect interstate commerce. *NFIB*, 132 S. Ct. at 2578.

In *United States v. Lopez*, 514 U.S. 549 (1995), the Court dealt with the third, and arguably broadest, category for exercising Congress's commerce power: where activities have a

---

government."); *Ex parte Quirin*, 317 U.S. 1, 25 (1942) (Congress "possess[es] no power not derived from the Constitution."); *United States v. Butler*, 297 U.S. 1, 62-63 (1936).

substantial relation to interstate commerce.  In *Lopez*, the issue was the constitutionality of a federal law criminalizing possession of a firearm in a school zone. Underscoring the critical importance of a substantial nexus to interstate commerce — that is, *economic activity* — the Court held that Congress had exceeded its commerce power, because "[t]he possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce."  514 U.S. at 567.

Similarly, in *United States v. Morrison*, 529 U.S. 598 (2000), the Court struck down a provision of the Violence Against Women Act because "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity." 529 U.S. at 613.  It concluded: "We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." 529 U.S. at 617.

In *NFIB*, the majority rejected the "substantial relation" prong of the commerce power as a basis for upholding the Individual Mandate.  While that category empowers Congress to legislate as to activities having a substantial effect on commerce, the failure or refusal of persons to obtain healthcare coverage is not economic activity; rather, it is the absence of economic activity, and hence is not subject to regulation under the commerce power.  *See NFIB*, 132 S. Ct. at 2587.

Where, as in *Lopez, Morrison*, and *NFIB*, Congress seeks to extend its reach to matters not involving economic activity — to matters divorced from interstate commerce —  it has exceeded its constitutional powers.

**C.   Driver data obtained by state and local law enforcement agencies and officers are not "things in commerce," and such access has no effect on interstate commerce.**

When Florida makes driver information available to its law enforcement community pursuant to its police power, it is not engaged in economic activity that can be subject to Congress' regulation. Similarly, the mere fact that a law enforcement officer obtained the plaintiff's personal information for a non-law enforcement purpose, without more, does not constitute economic activity subject to federal regulation.

Consistent with the nature and limitations of the commerce power, DPPA's provisions should be construed to apply only in the context of such data being "things in commerce" — and not in the context of information being shared on a restricted basis among law enforcement agencies and officers. This follows because providing driver information to law enforcement officers does not involve placing driver information into commerce, and there is no reason to suppose that it might, nor has the plaintiff alleged such a purpose.  In that context — central to the exercise of the States' police power — the information is noncommercial in nature, and thus the second category of commerce power cannot sustain congressional legislation controlling such sharing at the state or local level.

The sharing of driver information within the law enforcement community has no effect on interstate commerce — much less the requisite "substantial effect" required for the third category of commerce power to support congressional action.

This is the case in Florida.  Florida law expressly allows access to driver and vehicle data by "any state agency, state attorney, sheriff, or chief of police[,]" but with the added restriction that "[s]uch … state agency, state attorney, or law enforcement agency *may not sell, give away, or allow the copying of such information*."  Fla. Stat. § 322.20(9) (emphasis added).  The open

10

access to driver information for Florida's law enforcement agencies, coupled with the prohibition on the agencies' sale or disclosure of such information, underscores that data sharing is internal within the law enforcement agencies and *noncommercial* in nature.

Thus, the disclosures complained of by the plaintiff had no connection with interstate commerce, the constitutional lynchpin of DPPA.  The plaintiff's driver information was not an article in commerce or intended — or allowed by state law — to be placed in commerce. The case is limited to these narrow facts, which do not support federal regulation.

The commerce power cannot give Congress a basis for controlling how driver information obtained by a state is shared within that state's law enforcement community.  Such matters are for the States to decide, in the exercise of their general police power — a power denied to the federal government under the Constitution.

The plaintiff may cite to two recent DPPA opinions in companion cases from the U.S. District Court for the Northern District of Florida finding that Congress has the authority under the Commerce Clause to punish public officials for accessing driver information through DAVID in similar circumstances. However, those two orders lack in-depth analysis, and should not be persuasive here.

These cases involve orders denying a defendant's motion to dismiss in *Arce v. City of Gainesville,* DE 24, 1:13cv00137-MW/GRJ, Northern District of Florida, rendered September 9, and *Zittel v. City of Gainesville,* DE 26, 1:13-cv-0138-MW/GRJ, Northern District of Florida, rendered September 9.[4] The gist of the claims in both cases is that a Gainesville police officer obtained plaintiff's driver information using the DAVID system and then videotaped her through

---

[4] Attached as exhibits 1 and 2.

her window.  Because the claims and the court's rulings in both cases were virtually identical, we will address this analysis to the *Arce* order.

The *Arce* defendant challenged DPPA claim using a Commerce Clause theory similar to that articulated in this case: that DPPA was invalid as applied. Ex 1 p. 1-2. Without analysis, the district court rejected the Commerce Clause argument on the ground that the Supreme Court had already held that DPPA was a valid exercise of the Commerce Power in *Reno v. Condon,* 528 U.S. 148 (2000). "Inasmuch as the Supreme Court has already determined that the DPPA passes constitutional muster, this Court declines Defendant City of Gainesville's invitation to excise instances where drivers' information is misappropriated for individual use as opposed to instances in which such information is sold or released." Ex. 1 p. 2.

The *Arce* court misconceived the holding in *Reno*, which concerned driver data only in the context of being "things in interstate commerce" — one of three categories for the exercise of the commerce power by Congress (the other two being "channels of interstate commerce" and "activities that substantially affect interstate commerce," *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2578 (2010)).  The Supreme Court could not have been clearer in *Reno* that it was upholding DPPA as a constitutional exercise of the commerce power only in the context of driver data being "things in interstate commerce."  *Reno*, 528 U.S. at 148.  The Court noted that it was dealing with "motor vehicle information which the States have historically sold" and that "[b]ecause drivers' information is, *in this context*, an article of commerce, *its sale or release into the interstate stream of business is sufficient to support congressional regulation*." *Id*. (emphasis added).  While the State of South Carolina had brought the action, it did not raise – and the Court did not consider – the very distinct context of driver data being used within a State's law

enforcement community.  The Court highlighted both the commercial context and the facial

nature of South Carolina's constitutional challenge in further noting:

> South Carolina has not asserted that it does not participate in the interstate market
> for personal information.  Rather, South Carolina asks that the DPPA be
> invalidated in its entirety, even as it is applied to the States acting purely as
> commercial sellers.

*Id.* at 150 n.3.  The Court rejected South Carolina's broad facial attack precisely because the

States plainly do, in selling driver data, participate in interstate commerce, and within that

context plainly do subject themselves to congressional regulation.  Hence, the Court's citation to

and reliance on *South Carolina v. Baker*, 484 U.S. 505 (1988) (in which South Carolina willingly

participated in the market for selling bonds).  *Reno*, 528 U.S. at 150.  But the Court never dealt

with the as-applied challenge here, which concerns the States' uses of driver data in the context

of law enforcement, a classic State police power.  Obviously, the *Arce* court erred in construing

*Reno* as upholding DPPA as constitutional even as applied to the law enforcement context.

The *Arce* court's misunderstanding of *Reno* is further evinced by its misplaced reliance

on *Gonzales v. Raich*, 545 U.S. 1 (2005), which concerned a different category of commerce

power — activities that substantially affect interstate commerce — that was never touched upon

in *Reno* and never served as a basis for the Supreme Court's decision to uphold DPPA as a valid

exercise of the commerce power.  Where, as here, no showing can be made that the activity

substantially affects interstate commerce, that category of commerce power cannot support

congressional action.  *See United States v. Lopez*, 514 U.S. 549 (1995) (Gun-Free School Zones

Act exceeds commerce power); *United States v. Morrison*, 529 U.S. 598 (2000) (Violence

Against Women Act not supportable under Commerce Clause).

The *Arce* court's errors went yet further, to its summary rejection of the contention that extending DPPA to the law enforcement context violates federalism and the Tenth Amendment. The Supreme Court in *Reno* did not deal with these issues in the context of non-commercial law enforcement. It merely concluded that congressional regulation of States, insofar as they *choose* to sell driver data, does not violate federalism or the Tenth Amendment. That the context there was purely commercial explains why the Court rejected South Carolina's contention that *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997), controlled, and why the Court concluded "instead, that this case is governed by *South Carolina v. Baker*[]." *Reno*, 528 U.S. at 150.

The *Arce* court's failure to grasp the importance of the purely commercial context in *Reno* also led it to err in opining that the Supreme Court had rejected federalism and the Tenth Amendment as constraints on applying DPPA within the law-enforcement context. The Supreme Court said no such thing. It merely rejected South Carolina's contention that DPPA amounted to improper commandeering of state employees and resources, stating:

> The DPPA regulates the States as owners of data bases. It does not require South Carolina to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals. We therefore conclude that the DPPA is consistent with the constitutional principles enunciated in *New York* and *Printz*.

*Reno*, 528 U.S. at 151.

Nor did the Court indicate that federalism and the Tenth Amendment apply only insofar as Congress seeks to commandeer a State's resources or to force it to regulate per Congress's dictates. As Justice Kennedy stated, in his concurring opinion in *Lopez*:

> This is not a case where the etiquette of federalism has been violated by a formal command from the National Government directing the State to enact a certain

14

policy, cf. *New York v. United States* …, or to organize its governmental functions in a certain way, cf. *FERC v. Mississippi*, 456 U.S. [742 (1982)]….  While the intrusion on state sovereignty may not be as severe in this instance as in some of our recent Tenth Amendment cases, the intrusion is nonetheless significant. *Absent a stronger connection or identification with commercial concerns that are central to the Commerce Clause, that interference contradicts the federal balance the Framers designed and that this Court is obliged to enforce.*

*Lopez*, 514 U.S. at 583 (Kennedy, J., concurring) (emphasis added).

Here, in extending DPPA to the law enforcement context, no "commercial concerns" arise either to predicate congressional action under the Commerce Clause, or to counterbalance federalism and the Tenth Amendment.  Thus, the *Arce* court erred yet again in citing to *Rios v. Direct Mail Express, Inc.*, 435 F. Supp. 2d 1199 (S.D. Fla. 2006), which involved a purely commercial context in which motorists sued a direct marketer for violating DPPA.

Furthermore, even if *Gonzales* applies, the aggregate effects test cannot be satisfied. *Gonzales* was lawsuit over a California law allowing individuals to grow marijuana for their individual medical use. The Supreme Court's opinion rested on the fact that marijuana, even if grown and used for purely personal purposes, involved "a fungible commodity for which there is an established, albeit illegal, market." 545 U.S. at 19. The Court concluded that Congress could rationally conclude that privately grown marijuana would likely enter the stream of interstate commerce and have a substantial effect on prices and market conditions. *Id.* The "regulation is squarely within Congress' commerce power because production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for the commodity." *Id.* at 19.

The Court said that the test was not whether the respondents' activities in the aggregate *in fact* would substantially affect interstate commerce, but whether Congress could rationally

15

believe that they might do so. *Id.* at 22.  The Court also noted that the matters regulated were "quintessentially economic" in that federal law prohibiting marijuana cultivation "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative interstate market." *Id.* at 25. As such, the federal law in question "directly regulates economic, commercial activity." *Id.* at 26.

But our situation is different. The state documents at issue in this case are not marijuana. They are state public records essential for carrying out state police power functions that are entitled to different treatment when no economic activity accompanies their use. While there is a market for them in bulk for purposes of sales solicitations, *Reno v. Condon*, 528 U.S. at 143, it is incidental to their nature as public records in a database, and there is no demonstrable, corresponding market for individual driver license documents. Furthermore, there is no rational basis to conclude that the plaintiff's driver records are likely to find their way into the stream of interstate commerce, or if so, that in the aggregate, such leaks to the marketplace would have any substantial effect on prices or market conditions. Certainly driver records are not primarily intended for market use, as they are created for public safety purposes, and have none when they are accessed by police officers through DAVID.  It is hard to imagine how driver records, viewed on a computer screen, might find their way into the stream of interstate commerce.

Finally, the *Arce* opinion overlooks the impact of the Supreme Court's most recent pronouncement about DPPA, *Maracich v. Spears*, 133 S. Ct. 2191 (2013), in which lawyers had obtained driver records in bulk from the state's department of motor vehicles in order to solicit clients for suits against car dealerships. The question was whether the acquisition of driver

records was a permissible use under 18 U.S.C. § 2721 (b)(4), which permits the release of driver

records for use in litigation. The Supreme Court held that the solicitation of clients was a

business activity, and thus not covered by the exemption. 133 S. Ct. at 2203. But the Court was

careful, in construing DPPA, to note that driver records can permissibly be used in connection

with litigation, yet also for the business purpose of solicitation, a distinction that is not always

clear cut. The Court laid down a rule for when a use is permissible under DPPA and when it is

not:

> Because, in some cases, a communication sent with DPPA-protected information
> may serve more than one objective, a court must discern whether solicitation is its
> *predominant* purpose. . . . Where a reasonable observer could discern that the
> predominant purpose of obtaining, using, or disclosing protected personal
> information was to initiate or propose a *business* transaction with a prospective
> client, (b)(4) does not exempt the solicitation.

 133 S. Ct. at 2206-2207 (emphasis added).

Because driver records are susceptible to permissible and non-permissible uses, as well as

economic and non-economic uses, DPPA should, when applied constitutionally, be construed

using the *Maracich* "predominant purpose" test, which looks to whether the use intended for the

record was predominately for business purposes or not.  Here, there is no allegation of any

predominate business purpose.

**D.**   **Punishing Defendants Jones, Bailey, and Brierton for an alleged failure to**
**prevent the disclosure of the plaintiff's personal driver information violates**
**federalism and the Tenth Amendment.**

"If a federal regulation ostensibly justified by the Commerce Clause unduly infringes on

the general police power, a power that was never conferred on the national government, it

follows that such regulation exceeds the limited federal power." *Brzonkala v. Virginia*

*Polytechnic Inst. & State Univ.*, 169 F.3d 820, 903 (4th Cir. 1999). Neimeyer, J., concurring *aff'd*

*sub nom. United States v. Morrison*, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000);

*Printz v. United States*, 521 U.S. 898, 923 (1997) ("When a law ... violates the principle of state

sovereignty ... it is not a law ... proper for carrying into Execution the Commerce Clause.").

      The general police power rests at the core of state sovereignty; thus to read the

Commerce Clause broadly so as to infringe significantly on the states' general police power

undermines state sovereignty in violation of the federal structure created by the Constitution and

confirmed by the Tenth Amendment. *Printz v. United States*, 521 U.S. at 918-919; *Fed. Mar.*

*Comm'n v. South Carolina State Ports Auth.*, 535 U.S. 743, 769, 122 S. Ct. 1864, 1879, 152 L.

Ed. 2d 962 (2002); *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905) ("the State[s] did not

surrender [their police power] when becoming [] member[s] of the Union under the

Constitution."); *Lopez*, 514 U.S. at 566 ("The Constitution … withhold[s] from Congress a

plenary police power"); *Morrison*, 529 U.S. at 618 ("Indeed, we can think of no better example

of the police power, which the Founders denied the National Government and reposed in the

States, than the suppression of violent crime and vindication of its victims."); *NFIB*, 132 S. Ct. at

2578  ("Our cases refer to this general power of governing, possessed by the States but not by the

Federal Government, as the "police power."). See also *Com. of Va. v. Browner*, 80 F.3d 869, 880

(4th Cir. 1996) ("Congress lacks power to impinge upon 'the core of sovereignty retained by the

States.'").

      Consequently, the Commerce Clause must be interpreted to preserve the federal structure

of the Constitution and the states' general police power as an essential aspect of their sovereignty

within that structure. *Printz, supra; Brzonkala v. Virginia Polytechnic Inst. & State Univ.*, 169

F.3d at 905, Neimeyer, J., concurring.

Florida's ability to regulate public safety on the state's roads springs from its general police power and is a core attribute of state sovereignty. "[T]he power to create and enforce a legal code, both civil and criminal is one of the quintessential functions of a State." *Diamond v. Charles,* 476 U.S. 54, 65 (1986); *Younger v. Harris,* 401 U.S. 37, 46 (1971) (right to formulate and enforce penal sanctions is an important attribute of state sovereignty); *Pryor v. Reno*, 171 F.3d 1281, 1288 (11th Cir. 1999), judgment vacated on other grounds, 528 U.S. 1111 (1999) ("Only States collect driver's license and motor vehicle information. This is an exercise of sovereignty. See *Peel v. Florida Dept. of Transp*., 600 F.2d 1070, 1083 (5th Cir.1979) (Overseeing the transportation system of the state has traditionally been one of the functions of state government, and thus appears to be within the activities protected by the tenth amendment')"); *United States v. Best*, 573 F.2d 1095, 1103 (9th Cir. 1978) ("'[T]here is little question that the licensing of drivers constitutes 'an integral portion of those governmental services which the States and their political subdivisions have traditionally afforded their citizens'").

In addition, the state's ability to determine and to regulate its internal administration is equally a core attribute of state sovereignty. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)[5]; *Com. of Va. v. Browner,* 80 F.3d at 880 ("We also agree that an important aspect of a state's sovereignty is the administration of its judicial system.").

---

[5] "The present case concerns a state constitutional provision through which the people of Missouri establish a qualification for those who sit as their judges. This provision goes beyond an area traditionally regulated by the States; it is a decision of the most fundamental sort for a sovereign entity. Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign. 'It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers ... should be exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States.' *Taylor v. Beckham,* 178 U.S. 548, 570-571, 20 S.Ct. 890, 898, 44 L.Ed. 1187 (1900)."

The management of state records is fundamental to a state's internal administration and thus a core element of state sovereignty. Yet, the plaintiff reads DPPA *to override* state public records policy to the extent it purports to prohibit internal disclosures of Florida public records for noneconomic purposes, and dictates when and under what circumstances *state* records can be used, penalizing state officials should they violate the law.

Therefore, when DPPA penalizes Defendants Jones, Bailey and Brierton for the disclosure of state public records when the information is not an article in commerce and the disclosure does not involve economic activity, it violates federalism and the Tenth Amendment.

## II.   COUNT 1 — THE PLAINTIFF LACKS A PRIVATE RIGHT OF ACTION TO SUE INDIVIDUAL STATE OFFICIALS UNDER THE LEGAL THEORIES ASSERTED IN THE SECOND AMENDED COMPLAINT.

The plaintiff makes fact-free, formulatic allegations that defendants Jones, Bailey, and Brierton knowingly disclosed the plaintiff's driver information in violation of DPPA. DE 514 para. 329. But these claims are conclusory.[6] The plaintiff's real claim against them is for inadequate training and supervision, and implementing an inadequate system for managing driver information. DE 514 para. 131, 135, 136, 137, 138, 139, 140, 176, 176, 302, 303.

While the plaintiff may allege a DPPA cause of action based on the defendants' personal involvement in disclosures, DE 513 p. 8, their claim for inadequate training and supervision, and of implementing a system that failed to prevent unauthorized disclosures, is in reality an attack on the operation of the DAVID system *as a system.* However, the plaintiff lacks a private right of

---

[6] While Fed.R.Civ.P. 8 requires only a short plain statement showing the pleader's right to relief, a complaint cannot rely on conclusory allegations. It must provide sufficient facts from which a court can conclude that the allegations against the defendant are facially plausible. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008); *Speaker v. U.S. Dept. of Health and Human Services Centers for Disease Control,* 623 F.3d 1371, 1381 (11th Cir. 2010); *Lawson v. City of Miami Beach*, 2012 WL 6155342 *2 (S.D. Fla. Dec. 11, 2012).

action to sue for systemic failures. Congress has provided that only the U.S. Attorney General

has standing to seek relief for systemic failures to comply with DPPA.

18 U.S.C.  s. 2723(b) provides:

Any State department of motor vehicles that has a policy or practice of substantial
noncompliance with this chapter shall be subject to a civil fine imposed by the
Attorney General of not more than $5,000 a day for each day of substantial
noncompliance.

In contrast, Congress only provided a private cause of action against individual officials.

18 U.S.C.  s. 2724. Congress prohibited aggrieved citizens from suing state agencies for DPPA

violations. 18 U.S.C.  s. 2725(2).

Congress, of course, knows that a state agency can only act through its officials. By

providing a specific, capped monetary penalty for systemic violations, establishing "substantial

noncompliance" as the basis for a liability, and vesting the right to sue only in the Attorney

General for patterns or practices of noncompliance, Congress intended to foreclose the ability of

aggrieved citizens to sue individual officials for systemic violations. Any conclusion that

individual state officials can be personally liable for systemic violations directly conflicts with

the provisions of s. 2723(b). Individual liability is not conditioned upon a showing of substantial

noncompliance and damages are not capped in s. 2724. Thus, if a private right of action for

systemic failures exists, officials could be held liable — thus striking at the State itself — under

the lesser standard of proof in s. 2724 and they could be liable for greater damages than Congress

provided for in s. 2723(b).  The text of DPPA indicates that Congress did not intend this result.

See e.g., *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005)[7]; *S. Camden Citizens*

---

[7] "The provision of an express, private means of redress in the statute itself is ordinarily an
indication that Congress did not intend to leave open a more expansive remedy under § 1983. As
we have said in a different setting, '[t]he express provision of one method of enforcing a

*in Action v. New Jersey Dep't of Envtl. Prot.*, 274 F.3d 771, 779 (3d Cir. 2001) ("a section 1983 remedy is not available 'where Congress has foreclosed such enforcement of the statute in the enactment itself.'"); *Teen Ranch Inc. v. Udow*, 479 F.3d 403, 411 (6th Cir. 2007); *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1200-01 (8th Cir. 2013) (substantial compliance standard in statute indicates systemic rather than individual focus required to support a private right of action).

Any other conclusion renders s. 2723(b) surplusage.

Thus, because Congress provided for a specific remedy for systemic violations with capped damages and a higher burden of proof, and granted standing only to the Attorney General, the plaintiff cannot proceed with her systemic inadequacy case against these individual defendants. If nothing else, the State defendants are entitled to qualified immunity on this claim because the plaintiff's right to proceed on this cause of action is not clearly established.

## III.   COUNT 3 FAILS TO STATE A CLAIM.

It is difficult to know what to make of Count 3. The plaintiff alleges a violation of Fourteenth Amendment rights, DE 514 para. 365. Then, almost in a throw-away line, the plaintiff claims violations of the right to be free from unreasonable search and seizures, the right to privacy, and the violation of unidentified federal law. DE 514 para. 372.

However, search-and-seizure rights do not arise under the Fourteenth Amendment. They stem from the Fourth. Even if this claim properly invoked the appropriate source, the second

---

substantive rule suggests that Congress intended to preclude others.' *Alexander v. Sandoval*, 532 U.S. 275, 290, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Thus, the existence of a more restrictive private remedy for statutory violations has been the dividing line between those cases in which we have held that an action would lie under § 1983 and those in which we have held that it would not."

amended complaint fails to state a claim. The plaintiff has no protected Fourth Amendment rights in information held by a third party. *U. S. v. Miller*, 425 U.S. 435, 440-41 (1976); *United States v. Golden Valley Elec. Ass'n*, 689 F.3d 1108, 1116 (9th Cir. 2012).

The Eleventh Circuit years ago settled the question whether the plaintiff has any constitutionally protected privacy rights in DPPA protected information. She has no such rights. See *Collier v. Dickinson,* 477 F.3d 1306, 1308 (11th Cir. 2007).

## V.   COUNT 4 — STATE TORT PRIVACY CLAIM.

The plaintiff's state tort claim for invasion of privacy is meritless on the facts alleged.

That driver information in the DAVID system is public record is beyond dispute. See ss. 322.14 (defining what information is collected and displayed on driver licenses) and 119.01(1) and 119.011(12), Fla. Stat., stating that it is the state's public policy that all state records are open for public inspection and defining public records.

The State Constitution, Art. I, s. 23, Fla. Const., expressly deprives any information in a public record of privacy protection. *Michel v. Douglas*, 464 So.2d 545, 546 (Fla.1985); *Post–Newsweek Stations, Florida Inc. v. Doe*, 612 So.2d 549, 552 (Fla.1992) (The Florida Privacy Amendment does not "protect names and addresses contained in public records."); *Forsberg v. Housing Authority*, 455 So.2d 373 (Fla.1984) ("... section 23 specifically does not apply to public records ..."); *Borges v. City of W. Palm Beach*, 858 F. Supp. 174, 178 (S.D. Fla. 1993).

Any privacy rights pertaining to public records arise only from statute by way of an exemption from disclosure to the state public records law. *Alterra Healthcare Corp. v. Estate of Shelley*, 827 So.2d 936, 941 n. 4 (Fla. 2002).

Thus, the plaintiff has no state tort cause of action for the alleged release of her DPPA protected information.

Even if the plaintiff had such tort rights, she has failed to make a crucial allegation. Florida law requires that an invasion of privacy claim must allege that the protected information was substantially certain to be publicly disclosed. *Williams v. City of Mineola,* 575 So.2d 683, 689 (Fla. 5th DCA 1991) (no invasion of privacy claim where information obtained by numerous law enforcement officers but not substantially certain to be shared with public at large); *Bilbrey v. Myers,* 91 So.3d 887 (Fla. 5th DCA 2012). There are no such allegations in the complaint. Thus, it is insufficient as a matter of Florida law.

Therefore, the court should dismiss count 4 against Defendants Jones, Bailey, and Brierton.

## CONCLUSION

For these reasons the court should dismiss the action against the defendants with prejudice.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL

s/ *Jason Vail*

Jason Vail
Assistant Attorney General
Florida Bar no. 298824

Blaine H. Winship
Assistant Attorney General
Florida Bar no. 356913

Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300

24

Counsel for Defendants Jones,
Bailey and Brierton

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to counsel of

record through use of the Court's CM/ECF system on September 30, 2013.


s/ Jason Vail